```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                     STATESBORO DIVISION


 3

    UNITED STATES OF AMERICA,
 4
            Plaintiff,
 5
       vs.                       DOCKET NO. 6:11cr017-01
 6
    JARED H. WOODY,
 7
            Defendant.
 8

 9

10

11             TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE B. AVANT EDENFIELD
12         In the B. Avant Edenfield Federal Building
                    52 North Main Street
13                  Statesboro, Georgia
                    December 11, 2012
14               Commencing at 10:11 a.m.

15

16

    COURT REPORTER:   Kelly McKee Dorsey, CCR, RPR, CRR
17                     United States Court Reporter
                       P. O. Box 8552
18                     Savannah, GA  31412
                       912-650-4065
19

20

       (Proceedings reported by mechanical stenography, transcript
21    produced by computer-aided transcription.)

22

23

24

25
```

```
1                    APPEARANCES OF COUNSEL

2    FOR THE UNITED STATES OF AMERICA:

3        NANCY C. GREENWOOD, Esq.
         U.S. ATTORNEY'S OFFICE - AUGUSTA
4        P. O. Box 2017
         Augusta, GA 30903
5        706-724-0517
         Fax:  706-724-7728
6        Email:  nancy.greenwood@usdoj.gov

7    FOR THE DEFENDANT:

8        EDWARD J. COLEMAN, III, Esq.
         SURRETT & COLEMAN
9        233 Davis Road, Suite A
         P. O. Box 204720
10       Augusta, GA 30917
         706-722-3301
11       Fax:  706-722-3318
         Email:  edward@surettcoleman.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        THE CLERK:  Court sounds the case of the United States

2   of America versus Jared H. Woody, Criminal Action 611-017-01,

3   for sentencing.

4        MS. GREENWOOD:  Nancy Greenwood, ready on behalf of the

5   government, Your Honor.

6        MR. COLEMAN:  Edward Coleman, Your Honor.

7        THE COURT:  Good morning, Mr. Coleman.  Good to see you.

8        MR. COLEMAN:  Thank you, Judge.  Ready on behalf of the

9   defendant.

10       THE COURT:  All right.  We'll go through some of the

11   preliminaries.  Have a seat, Mr. Coleman and Mr. Woody.

12       The clerk has sounded the case of the United States vs.

13   Jared H. Woody.  Mr. Woody was indicted by the grand jury for

14   the Southern District of Georgia returnable to the Statesboro

15   Division.

16       On March 5th, 2012 and in the presence of Mr. Woody and

17   members of his family, Mr. Edward J. Coleman, III, who is a

18   member of the Bar of this court and whose offices are in

19   Augusta, Georgia, and Nancy C. Greenwood, AUSA Southern District

20   of Georgia, whose offices are likewise in the Augusta Southern

21   District of Georgia Judicial District, announced that plea

22   negotiations had resulted in a plea agreement between the

23   government and the defendant, and the Court needed to examine

24   the defendant pursuant to the requirements of Rule 11 of the

25   Federal Rules of Criminal Procedure.

1          The Court examined the defendant under that and found

2     that, I believe, he was a high school graduate and he was

3     enrolled at Georgia Southern College and that he understood the

4     plea agreement, that he had been counseled diligently by

5     Mr. Coleman.  He had the advantage of supportive parents and

6     other members of the community and that he, understanding all of

7     the rights to a trial by jury himself and independent of what

8     anyone else wished him to do, pled guilty and was found guilty

9     of Count 2 of the superseding indictment charging him with the

10    possession of child pornography in violation of 18 U.S.C.

11    2252A(a)(5)(B).

12          With the examination of the defendant under the

13    requirements of Rule 11 and the acceptance of the guilty plea,

14    the Court authorized the probation officers to make an

15    investigation for the Court; when that investigation was

16    complete, to prepare a written report and to make that report

17    available to the defendant, to the government and to the Court.

18          Ms. Greenwood, you have a copy of the report; is that

19    correct?

20          MS. GREENWOOD:  Yes, Your Honor, I do.

21          THE COURT:  And now, I have received all kind of

22    submissions of late.  I've received letters from a number of

23    people, including parents.  I have received yesterday a number

24    of pages, voluminous, in other words, narrations of messages

25    between -- that were part of the record now that the defendant

1   has submitted.  Have you seen all of those?

2           MS. GREENWOOD:  I have, Your Honor.

3           THE COURT:  All right.  Now, does the government have

4   any objections to the presentence report as prepared by the

5   probation officer?

6           MS. GREENWOOD:  No, Your Honor.

7           THE COURT:  Mr. Coleman, would you and Mr. Woody come

8   forward.

9           MR. COLEMAN:  Yes, sir.

10          THE COURT:  Mr. Coleman, have you received a copy of the

11  presentence report of the probation officer?  And the probation

12  officer assigned to this case is Marty C. Bragg, supervising U.

13  S. Probation Officer, whose duty station is in Savannah, who is

14  present in the courtroom.

15          MR. COLEMAN:  I have, Your Honor.

16          THE COURT:  And you have filed objections to the report

17  in several regards; is that correct?

18          MR. COLEMAN:  That's correct, Your Honor.

19          THE COURT:  We'll take those up now.  Mr. Woody, you may

20  have a seat over there while we take these up.

21          But let me ask you this, Mr. Woody.  Have you read the

22  report?

23          THE DEFENDANT:  Yes, Your Honor, I have.

24          THE COURT:  And have you had a chance to talk with

25  Mr. Coleman about the report?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And are there any objections to the report

3     as to the factual accuracy?  I will not ask you anything about

4     the legalities of it, but is there anything that you object to

5     that Mr. Coleman has not filed?

6          THE DEFENDANT:  No, sir, there is nothing I object to.

7          THE COURT:  All right.  You may have a seat.

8          Now, obviously counsel has been diligent in trying to

9     protect his client, but to object to the statements of the

10    mother of the victim, I don't think we need to dwell on that

11    very long, because --

12         MR. COLEMAN:  I agree, Your Honor.

13         THE COURT:  -- the probation officer's scope is much

14    larger than it might be an admissible statement under the Rules

15    of Evidence.

16         MR. COLEMAN:  I agree with that, Your Honor.  Judge, the

17    objections set forth in the first objection regarding the

18    offense conduct relate to Paragraphs 6 through 18, and

19    essentially the reason that I submitted the transcripts of the

20    text messages was the problem as I saw it was that the probation

21    officer was making selective use of some of the quotes.  And

22    that's perfectly understandable since they take up about 250

23    pages.

24         For the Court's information there were about 1500

25    photographs taken of the victim's telephone, and so each

1    photograph shows three or four lines of texts.

2          THE COURT:  Well, thank goodness you didn't inflict that

3    upon me.  I didn't see that.

4          MR. COLEMAN:  That's correct, Your Honor.  But one of

5    the filings that we did submit was all of those text messages --

6          THE COURT:  Yes.

7          MR. COLEMAN:  -- because in order --

8          THE COURT:  Well, I read through them last evening.  I

9    can't say that I can identify every one of them.  It was not

10   good reading.  I will say that.

11         MR. COLEMAN:  Yes, sir.  I agree with that.  So the

12   thrust of the objection in this part was simply that without

13   looking at the totality of the messages, it's hard for the PSI

14   to accurately portray the relationship and the communications.

15   But now that the Court has had the benefit of those transcripts

16   and has reviewed them, I don't think we need to cover that part

17   of the objection any further.

18         THE COURT:  All right.

19         MS. GREENWOOD:  Your Honor, may I speak to that point

20   just briefly?

21         THE COURT:  Absolutely.  As we go through objections, I

22   should have asked you to join in.

23         MS. GREENWOOD:  Thank you.  There were a handful of

24   messages, just probably just a few that are not actually

25   included in the document that was provided by defense counsel,

1   because the images that went with those text messages were

2   either child pornography or borderline child pornography.  And

3   so we did not provide to defense counsel those particular

4   images.

5          The ones that are excluded do not materially change the

6   totality of the impression that the Court can get by reviewing

7   what was submitted.  But I would note that what the Court didn't

8   see through this recitation of text messages were particular

9   texts where images were being distributed over the cellphones.

10          THE COURT:  I surmised such.  Go ahead.

11          MR. COLEMAN:  Yes.  Thank you, Judge.  Your Honor, if

12   the Court wants to move to the next objection.

13          THE COURT:  Yes.

14          MR. COLEMAN:  This is in Paragraph 2 of the objections.

15   And we raised this twice.

16          THE COURT:  That's on Page 3?

17          MR. COLEMAN:  Yes, Your Honor.  We raised this issue

18   twice as it appears in two different paragraphs of the PSI.  And

19   it's basically an objection to the enhancement for the use of a

20   computer, the two-point enhancement.  I recognize that case law

21   is very clear that the cellphone is a computer and that --

22          THE COURT:  Yeah, that seems to be taken off the table

23   by circuit law, and as a practical matter, I am given a

24   cellphone and it has so many features, I don't even know how to

25   use it.  I don't need it for that.  I just want to transmit

1    messages.

2          But nevertheless, they have a great capability to

3    transmit images, pictures, make photographs.  There is no

4    privacy left.

5          MR. COLEMAN:  Yes, sir.  Anyway, we don't need to

6    belabor that objection.  It's stated, for whatever it's worth.

7          THE COURT:  All right.  The Court accepts the probation

8    officer's conclusions.

9          MR. COLEMAN:  The next one, Your Honor, No. 3 on Page 4,

10   this has to do with the cross-reference.  The reason I object to

11   this is a very practical reason.  It takes a defendant like

12   Mr. Woody from a Level 18 to a Level 32 and just completely

13   blows up the scope of the Sentencing Guideline.

14         I asserted an objection to the cross-reference on the

15   theory that the government would not be able to prove the

16   causation element required in the cross-reference.  In other

17   words, the images of child pornography that are the subject of

18   this case were created by the victim on her cellphone, and they

19   were captured on that cellphone, and that's the physical

20   evidence that the government had.

21         Under the cross-reference there has to be a causation

22   element.  And in this case we think that there was such a

23   mutuality of interest in sexual discussions that this particular

24   individual didn't need encouragement and that the element of

25   causation is lacking.  So that's the basis of that objection.

1          THE COURT:  But aren't you overlooking one of the

2     essential things, she was a minor incapable of giving a consent

3     or anything of that nature?

4          MR. COLEMAN:  Well, the case law doesn't talk about a

5     minor being incapable.

6          THE COURT:  I know.

7          MR. COLEMAN:  But as a practical matter, I understand

8     the Court's position.

9          THE COURT:  Let me have Ms. Greenwood respond to this,

10    because it is a significant turn.

11         MS. GREENWOOD:  Yes.  Thank you, Your Honor.  I think

12    that the reason that turn is there, the reason the

13    cross-reference exists is really for a case similar to this,

14    where a defendant is permitted to plead guilty to an offense

15    that doesn't really take into consideration the full nature of

16    the conduct that he was engaged in.

17         Here the defendant was permitted, given his youth to

18    some extent and the nature of sexting that exists in society

19    today, that he was allowed by the government to plead to a

20    possession of child pornography charge instead of a production

21    of child pornography charge.  The production charge would have

22    carried a 15-year to 30-year statutory range per count of

23    conviction.  And so instead, he's looking at a maximum of 120

24    months, which is 10 years.

25         But his relevant conduct really incorporates this

1   production, and under -- the probation office, I think, does a

2   very good job of setting forth a response to this objection and

3   cites to a particular case, the Whitesell case, which is an

4   Eleventh Circuit case, which basically says, listen, if the

5   government can show by a preponderance of the evidence that the

6   defendant was aware that the victim was under the age of 18,

7   which you can certainly do here, because even by his own

8   admissions he knew that she was -- he first thought that she was

9   17, and then he knew that she was 14 and coaxed her into

10  creating any images of herself that were sexually explicit that

11  were sent or created, then that cross-reference applies.  And

12  that's what we have here.

13         And even by looking at the defendant's own exhibit,

14  these particular text messages, there are a number of locations

15  where you can see that this defendant was asking for pictures.

16  For instance, on Page 83 of this -- actually, it's listed under

17  the docket -- yes.  Page 83 of 267.  That's document number

18  86-1.  This is after -- well, this is when he thought that she

19  was 17.

20         The demarcations here indicate the defendant said,

21  "well, baby, daddy wants to see something very naughty right

22  now."

23         The victim says, "what does my daddy want to see?"

24         And defendant says, "do you have toys, baby?"

25         And the victim, "no.  Sorry, daddy."

1          And then the defendant says, "I was going to ask you if

2    you would stick something into your ass, bend over and take a

3    pic.  That would make me so happy."  And then there was a big

4    grin icon and a heart icon.

5          And then the response was, "well, if it makes my daddy

6    happy, would you mind if I use something uncommon?"

7          And then you actually have an image that is sent where

8    the victim has taken a picture of a door stopper that is just in

9    the nature that this defendant has asked for.

10         So that is only one of many examples of the defendant

11   asking for the victim to do certain things and her complying.

12   And that is all that is necessary.

13         Now, if the Court needs more to make a finding --

14         THE COURT:  No.  I agree completely.  I read that and

15   with the view of the solicitation of all kind of images and acts

16   and discussion of conduct that's off the chart -- anyway, the --

17         MR. COLEMAN:  Your Honor, can I respond briefly?

18         THE COURT:  Sure.

19         MR. COLEMAN:  The facts of the Whitesell case are

20   important because of the element of causation.  In Whitesell the

21   defendant, who apparently was much older than his victim,

22   bragged to other people on websites, chat rooms, that he was

23   able to manipulate the victim, that he was able to talk her in

24   to doing certain things and that he really was pulling her

25   strings, and therefore the Court had no difficulty in finding

1    that element of causation.

2            In this case, recall that we have a, admittedly,

3    14-year-old victim, who was introduced to Mr. Woody by her

4    friend, all right, who had previously had some sort of texting

5    relationship with Mr. Woody.

6            You can see from the transcripts immediately that Ms. --

7    that the victim in this case was not educated about these

8    matters by Mr. Woody, that she --

9            MS. GREENWOOD:  I object to that characterization, Your

10   Honor.  I think that, first of all, what Mr. Coleman is trying

11   to do is put the victim, who is 14 years old --

12           MR. COLEMAN:  Your Honor, can I finish?

13           MS. GREENWOOD:  -- on trial, instead of dealing with

14   this adult defendant.

15           THE COURT:  Let's talk one at a time.  Go ahead.  I'll

16   give you full response, Ms. Greenwood, time for it.  Go ahead.

17           MR. COLEMAN:  Your Honor, Whitesell talks about

18   causation, talks about manipulating a young victim, and the

19   point I was trying to make is that our victim -- and she is a

20   victim, Your Honor.  I agree with Ms. Greenwood on that.  But

21   you can tell from the context of it that she was familiar with

22   sexual language, sexual acts and that she did not require the

23   enticement.  It was a mutual, hey, let's show each other our

24   body parts.

25           So that's the distinction I would draw from the

1   Whitesell case, and so that is the basis for our objection of

2   the cross-reference, that the government does not have

3   sufficient grounds to prove that element of causation that is

4   required for the cross-reference.

5          MS. GREENWOOD:  And Your Honor, in response --

6          THE COURT:  I have been reading over and over the

7   defendant was dictating to the victim what he wanted her to do.

8          MS. GREENWOOD:  Yes, Your Honor.  And the Whitesell case

9   does not turn on the age of the victim or whether or not the

10  defendant was distributing it or somehow bragging about what he

11  had done.  The Whitesell case turns on whether or not the

12  government has proved by a preponderance of the evidence that

13  the defendant knew that the victim was under 18 and that he

14  coaxed her to engage in this activity.

15         And as the Court has pointed out, there are numerous

16  places in here, and some specifically related activities between

17  the victim and her dog where the defendant is clearly coaxing

18  the victim to engage in the activity.  She does not want to do

19  it.  She is not interested in doing it, but she winds up

20  acquiescing, at his repeated request.

21         And in those particular -- I'm not going to read those

22  texts, but those are Page 142 of 267 in document 86-1.  And I

23  think that if the Court were to review those, there could be

24  just no denying that this defendant was coaxing the victim

25  knowing that she was under 18 and the cross-reference should

1    apply.

2         THE COURT:  Okay.  Ms. Greenwood, your argument is

3    accepted by the Court.  I understand what Mr. Coleman is driving

4    at.  But it's almost beside the point.

5         Yes, she obviously was knowledgeable of all of the

6    crudities that I've never explicitly -- I assume all of them.

7    Maybe I'm overreaching, but obviously familiar with all the

8    crudities that are listed in those conversations.  There's not

9    much definition given.

10        MR. COLEMAN:  Thank you, Your Honor.  Your Honor, the

11   fourth objection we raise has to do with the two-level

12   enhancement.

13        THE COURT:  But let me say this in response to what you

14   said.  The probation officer encapsulated the benefits of a plea

15   agreement.  Had he faced a jury trial and the evidence was

16   sufficient, if not overwhelming, to have convicted him, he would

17   have faced a mandatory minimum term of 15 years to 70 years of

18   imprisonment.  And based on the Advisory Guideline range, it

19   would be 168 to 210 months.  And it seems to me that there was

20   not any malevolence on the prosecution to -- and they must have

21   taken into consideration his youth, his otherwise exemplary

22   record.

23        MR. COLEMAN:  I agree.  Judge, the fourth objection that

24   we raised had to do with the two-point enhancement where there

25   was the commission of a sexual act or sexual conduct.  This is

1   kind of a hyper-technical objection because of the conflicting

2   definitions of those terms in various parts of Title 18.

3          The probation officer has cited the Court to Aldridge,

4   and I'm not totally familiar with the facts of Aldridge, but we

5   asserted the objection for the reason that other case law that I

6   came across suggested that when you have a long-distance

7   relationship, that there cannot -- that the sexual contact or

8   conduct has to be between the parties.  In other words, self-

9   masturbation, in this case by the victim wouldn't constitute the

10  requisite sexual contact or sexual activity that the statute

11  contemplated.

12         And I recognize that Aldridge stands for a contrary

13  proposition, but we raise that objection just to preserve the

14  record on that point.

15         THE COURT:  Ms. Greenwood wishes to respond.

16         MS. GREENWOOD:  Thank you.  Just briefly, Your Honor,

17  the facts in Aldridge actually are a little bit different than

18  this case, and in that particular case the Court found that it

19  was sufficient that the defendant's own self-masturbation, even

20  though he had no direct contact with the victim, was sufficient

21  to meet the definition of sexual contact under 2G2.1(b)(2)(A).

22         And in this case we have that.  Certainly the defendant

23  was doing his own share of self-masturbating and sending those

24  images, but we also have the victim.  And the reason is because

25  the definition of sexual act is the intentional touching, not

1   through the clothing of the genitalia -- well, one definition is

2   of another person, but then in this particular definition it

3   says -- I'm sorry.  I was trying to read through this and I

4   didn't mark the right place.

5        Congress used the phrase "any person" when it meant to

6   include the offender himself as well as another individual, and

7   the phrase "another person" when it meant to exclude the

8   offender.

9        So the use of the phrase "any person" in the definition

10  of sexual contact demonstrates Congress's intent to include

11  masturbation among the acts to which the definition of

12  2G2.1(b)(2)(A) enhancement was meant to apply.

13       And that's what the Aldridge case says.  It's an

14  Eleventh Circuit case from 2009.  We think it's clear here by

15  the evidence, and there's really no dispute about it, that both

16  the defendant was involved in masturbating and the victim was

17  involved in masturbating, and therefore, the definition of

18  sexual contact is met.

19       THE COURT:  Yes.  The Court has accepted the position.

20  The objection is overruled.  Now we'll come down, once again, to

21  one we've already --

22       MR. COLEMAN:  That's correct, Your Honor.  That relates

23  again to the computer.  The Court's already dealt with that.

24       THE COURT:  Okay.  Give me a minute to reorganize.

25       The Court has listened to the objections, has done some

cursory research, has examined the record, and the Court with that background adopts the factual statements contained in the presentence report wherein there was no objection.

And as to the controverted factual statements in Paragraphs 6 through 18, I've already stated, but for the purpose of the record, I will again restate it:  That is, the information contained in the offense conduct section of the report, including the statement of the defendant, the statement of the victim's mother and the content of the text messages, the Court adopts the position of the probation officers as stated in the addendum.

Next, with regard to question of guideline applications that have been filed, in particular with respect to the conclusions in the presentence report contained in Paragraph 27 and 33, that is, an offense involving a computer; and 30, the cross-reference from the possession of child pornography guidelines to the production of child pornography guidelines; and 32, involving the commission of sexual contact.

The information in the record, and after considering the objections in the case, the case law, the Court concurs with the finding in the presentence report, including the addendum. Therefore, the applicable Advisory Guidelines are a Total Offense Level of 35, a Criminal History Category I, indicating 120 months of imprisonment, at least five years of supervised release, 20,000 to $200,000 fine.  No restitution is called for;

1    $100 special assessment is mandatory.

2         The Court notes that under Count 2, that the government

3    allowed and the Court accepted the plea.  There is no minimum

4    mandatory.  There is a maximum of 10 years in prison.

5         Now, the Court has received the letters that I

6    indicated.  They are part of the record.  They are from people

7    in the community, neighbors, parents and teachers and ministers

8    who have known him in church.  They are part of the record in

9    this case and reviewed by the Court.  And I believe I initialed

10   all of them.

11        The Court, as I said, spent a significant part of last

12   evening going back through the records.

13        Now, Mr. Coleman, as you know, this is an opportunity

14   for you to make any statement or present any information in

15   mitigation of sentence.

16        MR. COLEMAN:  Thank you, Your Honor.  Your Honor, I have

17   a couple of witnesses that we'd like to present.  Mr. and Mrs.

18   Woody would like to address the Court.

19        THE COURT:  All right.

20        MR. COLEMAN:  I'll let Jared make a statement at the

21   end, if that's permissible.

22        THE COURT:  Sure.

23        MR. COLEMAN:  And we have one or two other witnesses

24   outside.  If we could get Mr. Holloway.

25                    JOHN RAYMOND HOLLOWAY, being first duly

```
 1   sworn, testified as follows:
 2          THE CLERK:  For the record, sir, please state your name,
 3   spell your last name and state your occupation.
 4          THE WITNESS:  My name is John Raymond Holloway,
 5   H-O-L-L-O-W-A-Y.  And I am now retired from Statesboro Police
 6   Department.
 7          THE COURT:  The state what?
 8          THE WITNESS:  Statesboro Police Department.
 9                        DIRECT EXAMINATION
10   BY MR. COLEMAN:
11   Q.   Mr. Holloway, you live here in Statesboro?
12   A.   I live here in the county.  My home is out in Leefield,
13   Georgia.  That's out near Brooklet.
14   Q.   Thank you.  How long have you lived in Bulloch County?
15   A.   Practically most all of my life.
16   Q.   Do you know Mr. and Mrs. Curtis Woody?
17   A.   I do.
18   Q.   Do you know Jared Woody?
19   A.   Yes, sir, I do.
20   Q.   How long have you known the Woody family?
21   A.   Several years.  Since the kids were younger, babies, I
22   guess.
23   Q.   Would you say that your relationship with them was
24   intimate, close?
25   A.   I would think so.
```

1    Q.    All right.  Have you, for example, been to their home?

2    A.    Yes, sir.

3    Q.    On how many occasions?

4    A.    To give you a specific number, I don't know, but I would

5    say several times.

6    Q.    And for what reason would you go to their home?

7    A.    Socializing or dinners or pond fishing or just stop in and

8    visit.

9    Q.    Did you say pond fishing?

10   A.    Oh, yeah.  It's just a few times when I was there when I

11   spent an amount of time there where we fished his pond.

12   Q.    All right.  Did you know the Woody family in any other

13   context?  Did you socialize with them any other place?

14   A.    Well, church.

15   Q.    And what church was that?

16   A.    Body of Christ.

17   Q.    And how long were you and the Woodys members there at the

18   same time?

19   A.    I guess the Woodys may have spent, I don't know, five, six

20   years there.  I don't exactly remember the exact years, but a

21   good bit of time.  I had a chance to watch the kids grow up in

22   the church.

23   Q.    Mr. Holloway, what ages was Jared Woody, the defendant in

24   this case, what age range did you know him?

25   A.    I've known him since he was what I would consider a young

1  child, just above a baby, I mean -- it's been a while.

2  Q.   Have you had a chance to see him grow up?

3  A.   Yes, sir.

4  Q.   Have you had a chance to see him interact with his family

5  and other people in the community?

6  A.   Yes, sir.

7  Q.   And how would you describe his behavior?

8  A.   Any parent's child.  I mean any parent would be proud of

9  the child.  The Woodys are very protective of their family.  The

10  kid was always respectful to others, other than just his

11  parents.  Respectful to other kids.

12      I never seen him -- I never seen him aggravated or violent

13  child where he was upset with another child.  I've never seen

14  him do that.

15  Q.   Now, you've been in law enforcement for years and years;

16  right?

17  A.   I had the pleasure of retiring with 31 years.

18  Q.   If there's kids in Bulloch County that are troublemakers,

19  you know about them, don't you?

20  A.   I've had a chance to see very many of them that was

21  troublemakers, yes, sir.

22  Q.   Did Jared make trouble or associate with anybody who did?

23  A.   None that I know of.

24  Q.   All right.  Have you -- do you have any recollection of

25  Jared's involvement in the Body of Christ Church that you

1  mentioned?

2  A.    Yes, sir.  He interacted with what we have the young adult

3  class.  We have like activities for the young adults, dance

4  class and so forth, different activities for the young people

5  there.

6  Q.    All right.  And did you have occasion to see him interact

7  with other young people his own age?

8  A.    Yes, sir.

9  Q.    And did he behave appropriately, inappropriately?

10  A.    Like I stated before, I never seen him even upset with

11  another child, like kids would get in fights or have a

12  disagreement.  I have not seen him upset with another child, you

13  know, so no, sir, he's been what I would consider very polite to

14  all.

15  Q.    In particular, Mr. Holloway, did you ever have occasion to

16  see him be disrespectful to women, young women, older women?

17  A.    No, sir.

18         MR. COLEMAN:  All right.  That's all I have of this

19  witness, Your Honor.

20         THE COURT:  Ms. Greenwood.

21         MS. GREENWOOD:  Thank you.  Just briefly.

22                          CROSS-EXAMINATION

23  BY MS. GREENWOOD:

24  Q.    Good morning.

25  A.    Good morning.

```
 1   Q.    I'm Nancy Greenwood.  I'm with the U. S. Attorney's
 2   Office.  It's nice to meet you.
 3   A.    It's good to meet you, too.
 4   Q.    I've heard good things about your work when you were in
 5   law enforcement.  Are you familiar with the charge that
 6   Mr. Woody pled guilty to?
 7   A.    I'm familiar with the little that his father told me when
 8   he first got in it.  So in other words, do I know the case in
 9   and out of what evidence that the prosecuting attorney has, I
10   wouldn't know, ma'am.  I don't know it in that manner.
11   Q.    Okay.  But you know that he pled guilty to possessing
12   child pornography?
13   A.    Yes, ma'am.
14   Q.    And in your work in law enforcement, were you ever
15   involved in investigations related to individuals who had child
16   pornography or created child pornography?
17   A.    Somewhat, yes, ma'am.
18   Q.    Okay.  Was it sometimes surprising to the family?
19   A.    Yes, very.  And in this case to me.  Very surprising.
20   Q.    Right.  And that's just part of what happens in these
21   cases, because typically folks who are interested, or in that
22   direction of child pornography, that's not something that people
23   know about until the investigation leads you to those people.
24   Is that true?
25   A.    That's true.
```

1          MS. GREENWOOD:  That's all I have.  Thank you.

2          MR. COLEMAN:  Nothing further, Your Honor, of this

3    witness.

4          THE COURT:  Mr. Holloway, you're excused.

5          MR. COLEMAN:  Call Lisa Deloach.

6               LISA DELOACH, being first duly sworn,

7    testified as follows:

8          THE CLERK:  For the record, please state your name and

9    your occupation.

10         THE WITNESS:  Lisa Deloach.  And I'm a registered nurse

11   and an ordained minister.

12                      DIRECT EXAMINATION

13   BY MR. COLEMAN:

14   Q.    Ms. Deloach, do you live here in Statesboro?

15   A.    Yes, I do.

16   Q.    And how long have you lived here?

17   A.    All my life.  49 years.

18   Q.    Do you know the Woody family?

19   A.    Yes, I do.

20   Q.    Which members of that family do you know?

21   A.    I know Charlotte, Curtis, Jared and Jordon.

22   Q.    Jordon?

23   A.    Uh-huh.

24   Q.    That's Jared's little brother?

25   A.    Yes.

```
1    Q.    And how have you known them?
2    A.    I've known them through fellowshipping with them.  Their
3    boys and my boys are friends, and we fellowship at church some
4    years ago.  And also, you know, up to the present we fellowship
5    together.
6    Q.    All right.  Now, do you live near the Woodys?
7    A.    About -- about five miles.
8    Q.    And you have two sons?
9    A.    Uh-huh.
10   Q.    What ages?
11   A.    Ages 15 and 13.  I have two that's home.  Actually, I have
12   seven kids.  There's five that's out of the house and two that's
13   home.
14   Q.    And some of your sons are friends with Jordon and Jared?
15   A.    Yes, sir.
16   Q.    Over the years have you had a chance to get to know Jared
17   Woody?
18   A.    Yes, I have.  I sure have.
19   Q.    Have you ever been to the Woodys' home?
20   A.    Yes, I have.
21   Q.    On how many occasions?
22   A.    I can't count.  Maybe eight.
23   Q.    All right.  And have they been in your home?
24   A.    Yes.
25   Q.    Has Jared been in your home?
```

```
 1    A.    Yes.

 2    Q.    Has he spent the night in your home?

 3    A.    No, but he's spent countless hours at the house.

 4    Q.    Do you feel like you know him pretty good?

 5    A.    Yes, I do.

 6    Q.    Has he ever exhibited any behavior that troubled you or

 7    gave you pause?

 8    A.    No.

 9    Q.    How does he treat adults?

10    A.    Oh, he treat them with respect.  He respect his elders.

11    I've never seen him out of character.

12          I also have a niece that's around Jared's age, and they've

13    been friends.  They talk.  I've seen them fellowship at church

14    together.  I've never seen him disrespect any young women or

15    adults.

16    Q.    Have you seen him interact with other people his age in

17    church or elsewhere?

18    A.    Yes.

19    Q.    Does he get along with other people?

20    A.    Yes.

21    Q.    Does he have what you would view as normal relationships

22    with other people?

23    A.    Normal relationship, laughing, talking, joking, kidding.

24    Q.    Is he a good student?

25    A.    Yes.
```

```
1    Q.    How do you know that?

2    A.    Well focused because I've seen him.  I've seen him, and I

3    have talked with him about school.  Well focused.

4    Q.    Was he active in the church that you were a member of?

5    A.    Yes, sir.  When we were members -- I'll say they was

6    members and we attended Body of Christ, I've seen him a part of

7    this group called Ready.  He participated with that.  I've seen

8    Jared write poems that was very inspirational.

9    Q.    What was the Ready group?  Is that for young people?

10   A.    Uh-huh.  It's for young people to get them ready for the

11   leadership role once they leave home.  It's like an enrichment

12   program.

13   Q.    Okay.  Can you think of any qualities about Jared Woody

14   that are negative in your view?

15   A.    No.  No.  Hunh-uh.  No, sir.

16   Q.    He's always been well behaved as far as you know?

17   A.    Well behaved, to me, my husband, my family.  Just a

18   well-rounded, young, intelligent, smart young man.

19             MR. COLEMAN:  Thank you.  Your witness.

20             MS. GREENWOOD:  I don't have anything, Your Honor.

21             THE COURT:  You may step down, Ms. Deloach.

22             MR. COLEMAN:  Call Curtis Woody, Your Honor.

23                  CURTIS WOODY, being first duly sworn,

24   testified as follows:

25             THE CLERK:  For the record, sir, please state your name
```

```
 1   and your occupation.
 2        THE WITNESS:  My name is Curtis Woody.  I'm the director
 3   of the Center For Professional Development at Georgia Southern
 4   University.
 5                        DIRECT EXAMINATION
 6   BY MR. COLEMAN:
 7   Q.    Mr. Woody, you're Jared's dad?
 8   A.    Yes, I am.
 9   Q.    So you've known him a long time?
10   A.    Yes.
11   Q.    Mr. Woody, how long have you and your family lived in
12   Bulloch County?
13   A.    Well, we moved to Bulloch County permanently in 1991 after
14   having attended school here, both of us, for a number of years.
15   Q.    So you and your wife Charlotte grew up here?
16   A.    She grew up in Metter, Georgia, which is 20 miles away.  I
17   grew up in Claxton, which is another 20, and we both
18   matriculated at Georgia Southern where we met.  And we
19   eventually moved to Atlanta and got married and moved back here
20   permanently in 1991.  But we're very familiar with the area.
21   Q.    And Jared was born in 1992?
22   A.    That's correct.
23   Q.    So he's lived here all of his life?
24   A.    All of his life, yes.
25   Q.    How many children do you and Charlotte have?
```

1   A.    We have two sons, Jared and Jordon.

2   Q.    And how old is Jordon?

3   A.    Jordon is 15 years old.

4   Q.    And how would you describe the relationship between Jordon

5   and Jared?

6   A.    They're brothers.  They're very close.  They're very

7   competitive with one another, but they're very loving and

8   supportive of one another.

9   Q.    Mr. Woody, I guess it goes without saying that the

10  developments in this case have been shocking to your family.

11  A.    Yes.

12  Q.    I want to ask about the impact that this arrest and

13  conviction and incarceration has had on Jared's younger brother,

14  Jordon.

15  A.    Well, he's devastated.  But based on the person that he

16  is, he has masked it pretty well, and he's getting through it,

17  but you can tell he's really devastated.

18  Q.    Tell Judge Edenfield, if you would, what it was like

19  raising -- and I don't want to spend a lot of time on his

20  formative years, but how was Jared as a child, as a son?  Was he

21  a problem?  Was he easy?  Give us a sense for that.

22  A.    He's my -- he's delightful.  I mean it was a joy when he

23  was born.  He's our first-born son, and he has always been a

24  bright, inquisitive, sensitive, caring, respectful young man.

25  And very proud of him.  Never had a moment's worth of trouble

1  with him.  He never acted out.  We never had to worry about

2  where he was or what he was doing or who he was hanging out

3  with.

4       But just like any father and son, we've had our moments of

5  tension.  As we encouraged him to grow up to be independent and

6  to be independent thinking and to express himself, sometimes we

7  had disagreements about what it is he had in mind to do, but it

8  was always respectful.  And it was a model relationship, I would

9  say, between a father and son.

10      I didn't grow up with a father, so I don't know.  I don't

11  have a template to gauge it against, but I know that based on

12  what I expected of a son, he was that and more.

13  Q.   Mr. Woody, was there anything abnormal about Jared's

14  upbringing or his middle school years or his high school years?

15  A.   No.  He was always a bright, engaging, happy child, by all

16  appearances.  He had friends.  He was engaged in activities.

17  He's always been very smart; and he has had a normal, as far as

18  I can tell, life.  He's had his share of friendships with both

19  girls and boys.

20      He's engaged in sports activities.  He's been in

21  extracurricular activities.  He's been an excellent student all

22  of his life, to include recently where he's made the Dean's List

23  every semester he was at Georgia Southern.

24      He, by all accounts, was headed on his way to having a

25  bright future and continuing to be someone we would be proud of.

1    Q.   Mr. Woody, obviously there were things that Jared was

2    doing in his private time and the privacy of his bedroom that

3    you were not aware of, but let me ask you, as a young adult, did

4    Jared talk to you about matters related to sex?

5    A.   Oh, yeah.  Definitely.  As a matter of fact, it was one of

6    the things that I didn't tell him that, but I really looked

7    forward to having our conversations, because you know, again, I

8    didn't grow up with a father, so I didn't have the benefit of

9    that.  So I kind of cherished the moments.

10        And I was proud of the fact that he trusted me enough and

11   felt comfortable enough to kind of confide in me and ask me

12   questions about girls, and you know, how to talk to girls and

13   how to approach girls and how to better understand girls, as if

14   I knew.

15        But I delighted in giving him the benefit of my

16   experience.  So when he was in school and when he was also

17   working part time, when he would come home late at night, or

18   even after he was there at the house at the time, I'm sort of a

19   late-night owl, he'd come out and we'd talk and share stories,

20   and I'd try to give him advice and kind of steer him in the

21   right direction.

22   Q.   Well, I guess my basic question is this, Mr. Woody:  Based

23   on your conversations with Jared, is it your belief that his

24   interest in young women his own age was normal and healthy?

25   A.   Oh, absolutely, particularly when he enrolled at Georgia

1    Southern, because he enrolled at Georgia Southern a year early;

2    came out of high school and spent his last year of high school

3    at Georgia Southern.  And he was absolutely excited by the, I

4    guess, tremendous variety of beautiful young women that also

5    went to Georgia Southern.

6    Q.   All right.  But has he had much experience in dating?

7    A.   He's had some experience, but he's always been a little

8    bit shy and not really all that interested in some of the I'd

9    say outlandish behavior that a lot of young women engage in

10   today.  He's always been a thoughtful young man, interested in

11   young ladies that were, you know, more respectful, I would say.

12   Q.   Now, did you ever catch Jared viewing pornography?

13   A.   Yes, I did.

14   Q.   All right.  And did you all have a discussion about it?

15   A.   Oh, yeah.  We had quite a discussion about that, and I

16   warned him about it, and I even went to the extent of installing

17   sort of an Internet blocking software application on the

18   computers in the house.

19   Q.   Did he circumvent that?

20   A.   Yes.

21   Q.   Okay.  What did you tell him about pornography generally?

22   A.   Well, you gotta consider that my wife and I really have a

23   solid faith foundation, and so that's pretty much where we came

24   from.  We let him know that, you know, pornography in and of

25   itself was evil and that beyond that, it just led to nothing

positive, no good and that it was really a form of bondage and

enslavement and that he needed to not be bound by anything and

to be able to walk with liberty and freedom in his heart and in

his life, spiritually and otherwise.

Q.   Mr. Woody, did I share with you all those text messages

that my secretary typed up for me?

A.   Absolutely.  I read every exchange between the two.

Q.   All right.  And you recognize the extreme vulgarity in all

of it?

A.   Absolutely.

Q.   Among the messages back and forth is a lot of crazy

discussion about pedophilia and young children, and I will argue

to the Court my own sense of what that's about in those

messages, but do you have a sense for whether Jared has or

harbors any such feelings or ideas?

        MS. GREENWOOD:  Objection, Your Honor.  I think the

messages speak for themselves.  I don't know that the father can

speak to what was in Jared's mind.

        THE COURT:  Obviously if we were here on a

non-sentencing, non-background, your objection would be

sustained, but I take a broader view of the sentencing hearing

where the evidence comes from many sources.  The Court

recognizes the limitations.

        MR. COLEMAN:  Yes, Judge.

BY MR. COLEMAN:

1   Q.    Go ahead, Mr. Woody.

2   A.    No.  I mean I've never witnessed, never had any reason,

3   any evidence to believe anything other than the fact that he was

4   a healthy, heterosexual male interested in young women his age.

5   So no.

6   Q.    All right.  Mr. Woody, you mentioned that you and your

7   wife have a strong faith.  Tell the Court what you know about

8   Jared's own faith.

9   A.    Well, first, let me say that faith is different from

10  religion, at least in our minds.  Our faith is based on our

11  relationship with Jesus Christ and not a code of conduct handed

12  down by denominations and so forth.  But I won't get into that.

13        We have taught Jared to believe in God and to believe in

14  Jesus Christ as God's son and to believe in Him as his Savior,

15  and to look to Him for guidance and wisdom in life, and to trust

16  the indwelling Holy Spirit for inspiration and direction and

17  strength and sustenance in life.

18        And even though we believe strongly, we've not rammed our

19  faith down his throat.  We've encouraged him to know the Word

20  for himself and to come to his own understanding about God and

21  his own relationship with Jesus Christ and to just take

22  ownership of his own spiritual identity and his everlasting

23  future, his life.

24  Q.    Mr. Woody, how do you reconcile his faith, his belief, his

25  values as you've tried to teach him, how do you reconcile that

1   with what we read in those messages?

2   A.    Well, I'll put it like this.  All of us have come short of

3   the glory of God, and I don't think there's a person in this

4   courtroom, not one, who hasn't made a mistake in life before.

5   There's not a person in this courtroom, not one, who has some

6   aspect of their life that they'd rather someone else not know

7   about, whether it be a relationship with someone of the same sex

8   or a relationship with someone who they shouldn't be related to,

9   or could be nonsexual, but I know for a fact looking at everyone

10   in this courtroom there's not one who is without sin.

11       And the beauty is that the Lord Jesus Christ has died for

12   all of our sins, and I respect the Court, and I respect the role

13   of the judge in sentencing and the prosecutor in doing their

14   job, but the fact of the matter is, either one of us could be up

15   here on this stand facing prosecution for what we are doing,

16   have done or will do in the future.  And I just thank God that

17   Jesus came and died on our behalf.

18       So I'm not surprised that Jared, just like many of us,

19   allowed his flesh to act out, so to speak, and I just want to

20   say that, you know, he is still, in spite of the problems, the

21   mistake that he made, he is still my beloved son in whom I am

22   well pleased.  And I'm just pleased to know that we too are

23   God's beloved sons in whom He's well pleased, even though we

24   constantly make mistakes or are fallible ourselves.

25   Q.    Mr. Woody, Jared's been in custody since about January

1    18th or 25th?

2    A.    Yes.

3    Q.    He had a problem with his leg monitor.  Do you remember

4    that?

5    A.    Do I, yes, I do.

6    Q.    So he's been in jail in Bulloch County and now Emanuel

7    County for almost a year?

8    A.    That's correct.

9    Q.    What's been the impact that you have observed on Jared

10   being in custody?

11   A.    Well, the impact on us as a family has been tremendous.

12   You know, there's not a minute that goes by that we don't think

13   about the potential outcome for his life, more so than ours.

14   But we're inextricably tied to him, so what happens to him

15   happens to us.

16        I've been concerned about his young brother.  He doesn't

17   wear his emotions on his sleeve.  He doesn't express himself a

18   lot, but he's painfully aware of everything that's going on.

19   He's aware of what happens to us emotionally.

20        But as far as Jared is concerned, I have to say that I'm

21   extremely proud of Jared, the way that he has held up, the way

22   that he has endured throughout this whole process.  He's been in

23   jail since January, and you can imagine not having ever been in

24   trouble, not ever having any authority -- problems with

25   authority, that being incarcerated, facing such a serious crime

 1    and a potential sentence, it's gotta be devastating on him.  But

 2    he has not shown that part.  He has been very strong and very

 3    resolute.

 4         The thing that I'm probably most impressed with Jared

 5    about is that he has turned his attention to other people in

 6    there, other people who don't have a supportive family, who

 7    can't put money on books and telephones and who don't have a lot

 8    of education, who don't really have a lot of people to turn to.

 9    He's constantly tried to help them even to the point where when

10    he talks to us, he'll ask us to pass on messages to the parents

11    and loved ones of other people in there.

12         He's tried to help them read.  He's tried to share

13    information with them, tried to comfort them, you know, when

14    they're facing sentencing and things of that sort.  And you just

15    can't teach that to someone, and I'm extremely proud of him as a

16    man, not as my son, but as a man for his strength, for his

17    courage and for his compassion and commitment to other people.

18    Q.   Mr. Woody, he's been in prison essentially almost a year.

19    He will be forever a convicted felon.  There will be limitations

20    on his life as a result of the nature of this conviction.  Are

21    you able to think of how further imprisonment of a young man,

22    very young man in a federal penitentiary would make him less

23    likely to reoffend?

24    A.   To be honest with you, I'm at a loss.  I really don't get

25    it.  I understand that what he did was wrong and what he did was

against the law.  What I don't understand is the inability to see the mitigating circumstances surrounding it.

You know, we watch -- my wife and I watch television a lot, the news a lot, and you know, we see young people spread eagle over the front of a police car, and you know, we've seen the negative sides of crime and the impact that it's had on families.  We never thought our son would be in a situation like he's facing today.  We never thought that would come to our doorstep.

Jared has such great potential.  He made a serious mistake.  There's no doubting, no denying that.  But I think that he's exactly the kind of individual that our system should try to rescue and salvage, because the potential he has to contribute to society as a gainfully employed, productive citizen of the United States has so much potential and such an up side, I really don't see how sending him to a federal penitentiary where he's surrounded by individuals who specialize in crime, and taking away his opportunity and his potential to be productive and to really make a difference in the lives -- a positive difference in the lives of people.  I don't really see how that helps society at all.  I truly don't.

Q.    Mr. Woody, thank you.  When Jared was arrested in January of this year, was he able to withdraw while passing from Georgia Southern University?

A.    Yes.  As a matter of fact, we had to scramble to actually

officially withdraw him because he was a recipient of the Hope

Scholarship.  And he, as I said earlier, had an exemplary

academic record.  He made the Dean's List every semester he's

been at Georgia Southern.  So he has close to a perfect GPA.

Q.    And he's still eligible for the Hope Scholarship?

A.    Yes.  That's why we withdrew him altogether.

Q.    Is he in a four-year degree plan?  How far along is he?

A.    If this had not occurred, he would have graduated this

spring semester with a management degree with logistics and

intermodal transportation.

        MR. COLEMAN:  That's all I have, Judge, of this witness.

        MS. GREENWOOD:  I don't have anything, Your Honor.

        MR. COLEMAN:  If I could call briefly Charlotte Woody.

                CHARLOTTE WOODY, being first duly sworn,

testified as follows:

        THE CLERK:  For the record, ma'am, please state your

name and your occupation.

        THE WITNESS:  My name is Charlotte Parrish Woody, and

I'm the director of marketing at Georgia Southern University in

the division of continuing education.

                    DIRECT EXAMINATION

BY MR. COLEMAN:

Q.    Ms. Woody, more important than that, you're Jared's mom;

right?

A.    Yes.

1   Q.   And I'd like to spend just a little bit of time with you

2   and ask you, you understand the severe punishment that Jared

3   faces in this case, do you not?

4   A.   Yes, I do.

5   Q.   And are you here to plead on behalf of the Court showing

6   mercy on Jared?

7   A.   Absolutely.

8   Q.   And would you tell the Court why you think that would be

9   appropriate.

10  A.   Well, Jared's my son, first of all.  I gave birth to him,

11  but I'm also a believer, and God created us all in His image and

12  His likeness, and He's put a plan of redemption in place for us

13  all, but the key is we have a free will, and it's important for

14  us to come to know who He is, and that allows us to begin to

15  move in a different way of life.

16  Q.   Tell the Court some things about Jared that you wish Judge

17  Edenfield knew.

18  A.   Well, my husband and I left Atlanta 22 years ago because

19  we wanted a family, and our jobs took a lot of our time.  So

20  when we moved here, nine months later I was pregnant, and I did

21  have an opportunity to return to Corporate America, but I needed

22  a place where I could spend time raising my children.

23       I worked with a lot of people that didn't have the family

24  support and things of that nature, so my husband and I decided

25  to relocate to this area so that we could have that family

1    support.

2        I taught as a professor for the first 10 years of Jared's

3    life.  We knew that based on our level of education that we had

4    achieved, we knew we wanted our children to also achieve that

5    same level of education.  We knew that they needed that in order

6    to be successful.  So I spent a lot of time with Jared in his

7    early years of life.  Jared participated in a lot of activities

8    through the rec department.  He was a baseball player; played

9    basketball, football and played golf.

10        In the fifth grade he was part of the gifted program in

11   the elementary school that allowed him to receive accelerated

12   training in his discipline, education.  He traveled to Kennedy

13   Space Center -- it was the first time he was away from us --

14   when he was 10 years old.  Went to New York, Washington, D.C.

15   He traveled with several other groups that were in that age

16   range up until high school.

17        When he reached high school, he was in an accelerated

18   program there.  He actually graduated a year early.  So he's

19   excelled academically.  He's done a lot of things.

20        But the bottom line is Jared is still maturing.  He's a

21   young -- he's 20 now, but at the time this occurred he was 18

22   years of age.  So he hadn't really experienced a lot, you know,

23   in the world.

24   Q.   And he hadn't done a lot of dating?

25   A.   No, he hadn't.  But I knew that was something that he

1    desired because he shared a lot with me.  We talked a lot about

2    -- you know, one of the things that I wanted to instill in our

3    sons, and I still believe this today, that God has already put a

4    person in this life for him, but it's important for him to

5    follow God to be able to find that person.  And that's what

6    happened with my husband and I.  I prayed before my husband ever

7    showed up in my path, and when he did, the Lord confirmed that

8    three years after we were married that He had answered my

9    prayer.

10          So that's what I believe in, and that's what I share with

11   my sons, that it's important to be led by the Lord, not by the

12   flesh.

13   Q.   Does Jared have a strong faith?

14   A.   He does.  You know, as I said earlier, we all have a free

15   will.  You know, just because you're born into a Christian

16   family doesn't make you a Christian.  Jared's had to come to

17   know the Lord for himself.  And that is not religion.  It's a

18   relationship.  It's where you are walking and talking with Him

19   daily, seeking His direction, seeking His guidance.  And that's

20   what I've come to know and that's what I've taught my sons.

21          Now, to the experience that Jared has a level of

22   experience that I have, that's different because there have been

23   a lot of challenges in my own life, and I've watched God heal me

24   and deliver me and bring me into places I never thought I would

25   ever -- levels I would never achieve on my own.

1    Q.    Ms. Woody, if Judge Edenfield sentences Jared to 10 months

2    with credit for time served, which essentially would mean that

3    he would be free --

4    A.    Yes.

5    Q.    -- but ask that he be subject to some sort of home

6    confinement --

7    A.    Uh-huh.

8    Q.    -- is that a situation that you and your husband would

9    welcome?

10   A.    We would.  And I think based on what Jared has

11   experienced, there are so many young people who are going

12   through the same thing that he's going through.  We have so much

13   technology at our fingertips that, you know, it's amazing.

14         But I think the most important thing is that Jared can

15   share his story with a lot of other people.  We have a ministry,

16   my husband and I have a teaching ministry called "Right

17   Believing Ministries."  We have a television broadcast called

18   "Conversations in Grace."  And there's an opportunity for

19   ministry.  My husband has created an area called "The

20   Unpluckables" for teenagers, and it's an opportunity to minister

21   to them so that they can avoid some of the things that our son

22   has avoided.

23   Q.    Has Jared expressed an interest in participating in that

24   and telling --

25   A.    He has.

Q.    -- his story?

A.    He has.

Q.    Do you believe that he's truly contrite for what he did?

A.    He is.  My husband asked him when we went to visit him on Sunday what he's learned from this experience, and he said he's learned that he can't trust himself; he can't trust any man.  He can only trust God.  And he knows that he cannot live this life without having that spiritual guidance.

Q.    Do you think that going to federal prison will in any way be a greater punishment than what he's already endured and that your whole family has endured?

A.    Well, certainly we don't want him to go to prison.  That's not my desire.  That's not Jared's desire.  But the bottom line is Jared will excel wherever he goes.  I've watched him over the last 15 months be more concerned about other inmates and their needs than he has about his own needs.

We get phone calls every night for family members who either don't have the money for store call, the money for phone calls, and we translate messages or send messages to families about court dates or whatever their needs are, money on their books or whatever.  And Jared has freely through his heart been willing to do that.

Q.    Jared ever been in a fist fight in his whole life before he went to jail?

A.    Never.

```
 1   Q.    Did he have a fight in jail?

 2   A.    He did.

 3   Q.    Are you concerned about his safety if he goes to a federal

 4   penitentiary?

 5   A.    I know that through my faith that God provides protection

 6   for us, and I truly believe Him and I truly honor Him in my

 7   life, and Jared does as well.  So we pray for that protection

 8   every day.

 9   Q.    All right.  Thank you, ma'am.  That's all I have.

10   A.    Thank you.

11         THE COURT:  Ms. Greenwood.

12         MS. GREENWOOD:  Thank you, Your Honor.

13         THE COURT:  Would you like the podium?

14         MS. GREENWOOD:  Yes.  Just briefly.

15                    CROSS-EXAMINATION

16   BY MS. GREENWOOD:

17   Q.    Ms. Woody, we've spoken before; correct?

18   A.    Yes, we have.

19   Q.    And you're aware that the statutory penalties for the

20   charge that your son is facing are significantly lower than what

21   they would have been if he'd been charged with production of

22   child pornography?

23   A.    Sure.  Yes.

24   Q.    So he can't get more than 10 years here today, although he

25   could have gotten the mandatory minimum of 15 going all the way
```

1   up to 30?

2   A.    Yes.

3   Q.    And that's a benefit that he's already receiving?

4   A.    Okay.  Yes.

5   Q.    Now, I don't know how -- I know that you have some

6   familiarity with the facts of the case.  I don't know that you

7   have as detailed a familiarity as your husband.

8   A.    No.  I don't.  Not as much, but I have some of the

9   information.

10  Q.    You're aware that the victim in this case is a girl who

11  was 14 years old; is that right?

12  A.    Yes, I am.

13  Q.    And the impact of the relationship that she and your son

14  had on -- over the phone where he was encouraging her to take

15  certain pictures and send them to him --

16  A.    Uh-huh.

17  Q.    -- you would agree that that's going to impact her for

18  quite some time.

19  A.    I agree that she's been -- yes.

20  Q.    Yes.  And that she will -- that may impact her life and

21  her relationships for years to come?

22  A.    Uh-huh.

23  Q.    And do you think that's something that the Court should

24  also take into consideration when fashioning a sentence for your

25  son?

1  A.   I understand -- and I guess the key for me is the fact

2  that, you know, as parents, you know, we're not always aware of

3  everything that's going on in our children's lives.  My job is

4  to inform my children of what I've learned throughout my life.

5  And but they also have -- they make decisions, too, that many of

6  the parents aren't aware of.

7      I know that Jared made a decision that has created the

8  challenges that he faced, and he's taken responsibility for

9  that.  And I guess I'm praying for that family, for that young

10  lady, that that family will also come together for some sort of

11  healing, some sort of, you know, whatever is needed to restore

12  her as well.

13          MS. GREENWOOD:  Okay.  That's all I have.  Thank you.

14          MR. COLEMAN:  Nothing further of this witness, Your

15  Honor.

16          THE COURT:  All right.  You may step aside.

17          MR. COLEMAN:  Your Honor, Mr. Woody would like to make a

18  brief statement to the Court.

19          THE COURT:  Mr. Woody, the law requires that I inform

20  you you have a right to make a personal statement to the Court

21  before the imposition of sentence.  And this is the time.  Of

22  course, you understand at the same time you are not required to

23  say anything.

24          THE DEFENDANT:  Yes, sir.  I understand.  First of all,

25  I'd like to thank all the witnesses that came to speak for me,

1    and my parents, I would like to thank them for supporting me.

2    And I would like to apologize to the Court for my actions.

3        I was communicating with what I thought was a

4    17-year-old girl, and I did eventually find out she was 14, and

5    I communicated with her for a few days after that.  But I would

6    like to apologize for my actions.

7        I am a young man, so I'm subject to these kind of

8    actions, but I made a mistake, and I'm in no way condoning my

9    actions.  I know that I broke the law, and I know that

10   punishment is required.

11       But I do ask for leniency so that I may get back to my

12   life, get back to my family who love me and get back to my

13   younger brother so that I may help guide him and prevent him

14   from coming into contact with the law.  So that's what I would

15   say, Your Honor.

16       THE COURT:  Okay.  Anything else, Mr. Coleman?

17       MR. COLEMAN:  By way of argument, Your Honor.  Would

18   that be appropriate?

19       THE COURT:  All right.  You may have a seat, Mr. Woody.

20       MR. COLEMAN:  Your Honor, we spent some time this

21   morning going over some objections to the Sentencing Guidelines

22   because when you do the numerical calculation, the PSI gets you

23   around 168 to 210 months.

24       And because I want this Court to go all the way down to

25   10 months, time served, I was interested in trying to get those

1    numbers down so that you didn't have to move quite so far,

2    because in my view I don't want the Court to have to --

3              THE COURT:  It is what it is, though.  You know.

4              MR. COLEMAN:  That's right.

5              THE COURT:  You can't change the facts.  You can't

6    change the Guidelines.  You can't change the law.

7              MR. COLEMAN:  Right.

8              THE COURT:  And so you run into a wall when you do that.

9    I understand it's like pulling a person across a line.  The

10   closer you can get him to it, the easier it is.

11             MR. COLEMAN:  So happily, Your Honor --

12             THE COURT:  I'm still reading the law.

13             MR. COLEMAN:  Right.  And that's what I want to talk

14   about, what the state of the Guidelines law is, because it seems

15   to be a little bit of a moving target.

16             THE COURT:  Let me read you what Justice Breyer said

17   about the Guidelines.  In a syllabus says, "nor can I find much

18   help in the majority reference to a sentencing tradition that

19   considers every convicted person as an individual."  He's

20   quoting Koon vs. United States, 518 U.S. 81.

21             "That is because individualized sentencings" -- well,

22   I'll ponder -- "is not the only relevant tradition.  A just

23   legal system seeks not only to treat different cases

24   differently, but also to treat like cases alike.  Fairness

25   requires sentencing uniformity as well as efforts to recognize

1   relevant sentencing differences.

2          "Indeed, when Congress enacted the sentencing statutes

3   before us, it focused upon the unfair way in which federal

4   sentencings failed to treat similar offenders similarly; and

5   Congress wrote statutes designed primarily, though not

6   exclusively, to bring about greater uniformity in sentencing.

7   See Booker.

8          "The statutes do so in large part through the creation

9   of a system of guidelines written by a Sentencing Commission

10  which Congress intended the courts to follow.

11         "Booker makes clear that the remaining statutory

12  provisions, while leading us to call the Guidelines advisory

13  rather than mandatory, do not give sentencing judges carte

14  blanche to apply or not to the Guidelines as the judge chooses.

15  Rather, the district courts who are not bound to apply the

16  Guidelines must consult these Guidelines and take them into

17  account when sentencing."

18         In this very courtroom recently, and almost every month

19  we have this type of case.  Each one of them is shocking to a

20  rather prudish person.

21         Earlier in the week we had a 50- or 60-year-old man from

22  Augusta whose twin brother had a completely different pattern.

23  The man had been sentenced to 220 months in Virginia;

24  ironically, the same place we have this spilling over into, as I

25  recall, and he received 360 months here.  He had potential, too,

1   because his brother overcame a lot of difficulties.  Identical

2   twins.

3           He became a truck driver.  He was dealing with little

4   children.  He was putting horrible stuff in the Internet and all

5   of those sources.  He did not have -- he had his brother, his

6   twin brother and his sister from Augusta to speak for him.  I

7   see this day in, day out.

8           What I have is the law and the Guidelines.  So when you

9   make your thrust, remember that I take Justice Breyer's word as

10  a good solution and the only proper solution to having a

11  fairness in a system that was repugnant so many years ago

12  because I used to say it depended upon what the judge had for

13  breakfast, whether he had a good -- he read the sports page or

14  the headlines.

15          We took away a lot of that.  Judges have complained

16  about it.  But it's a fairer system where the rich, the poor,

17  the educated, the uneducated and all variants of society have a

18  calculation the same way.

19          And every human being is unique.  There is something

20  that can be said good and bad about every citizen, or every

21  human being.  So the bull is not going to be pulled across the

22  line, Mr. Coleman, if you get the message.

23          MR. COLEMAN:  May I be heard?

24          THE COURT:  Yes.

25          MR. COLEMAN:  Thank you.  Judge, I agree with the notion

1  that the Guidelines were intended to bring uniformity so that

2  judges didn't treat specific individuals more favorably and then

3  lose track of who was getting sentenced for what.  The

4  Guidelines help the Court with that job of uniformity.

5       The problem in this case is I don't want the Court to

6  focus so much on Jared Woody and his accomplishments as a

7  student or an athlete or his religious beliefs.  I want the

8  Court to concentrate on what happened in this case.

9       This is a case about sexting.  Congress did not create a

10  separate statute to cover sexting.  The only reason that we're

11  here and treating this as a child pornography case is because

12  under the definitions as Congress set it out, this young woman

13  was of the appropriate age for the definition, and the images,

14  at least one of them meets the definition of pornography because

15  of the body parts that it shows.

16       But with those technical exceptions, sexting is not --

17  sexting between teenagers is not uniform with other types of

18  child pornography.  And for the Court to say, well, my hands are

19  tied, child pornography is child pornography is not a correct

20  way to view the facts of this case.

21       Now, in our culture things are different from when you

22  and I were growing up.  There's an age difference between you

23  and I, but not as much of a difference as between me and

24  Mr. Woody.  Things are different.

25       When people like Brett Favre, an athletic icon, are

accused or admits to giving images of his body to other young

women, when congressmen like Anthony Weiner are similarly

guilty, it doesn't take much of an imagination, Your Honor, to

know that every teenager with a cellphone that has a camera has

the opportunity to fall into this same trap.

Now, Mr. Woody thought he was communicating with a

17-year-old girl when this situation first arose.  And what he

was doing with that 17-year-old girl is what goes on all across

this country every day.  Sexting is different, and many states,

four or five states over the last few years have recognized

that.  They have amended their child pornography laws to say,

wait a minute, this case is different from a 55-year-old man

going out and trying to find some young child to do something

improper with.  This case is more akin to a childish dating type

relationship.

The text messages that I filed in my second submission

yesterday, I took out, Your Honor, those texts where these

parties both describe themselves as being in love, as dating, as

being boyfriend and girl friend.  Obviously the purpose of this

relationship was to essentially talk about sex.

But on top of it, on top of it, they viewed their

relationship in a different light from the typical child

pornographer, who has simply a prurient interest in typically

much younger victims.  And for the Court to say that I can't

treat this case differently from the truck driver you just

1    talked about is inaccurate.  You should treat it differently,

2    because it is different.

3          THE COURT:  You're misquoting, and I won't try to

4    correct you, but counsel ought not misquote me.

5          MR. COLEMAN:  I'm misquoting the Court?

6          THE COURT:  And the conclusions that I stated, or talked

7    about.

8          MR. COLEMAN:  Yes, sir.  Your Honor, I can't emphasize

9    enough how widespread this problem is.  I was watching the

10   Georgia-Georgia Tech game on television and a commercial came on

11   --

12         THE COURT:  Killing, murder, rape, drugs are widespread.

13         MR. COLEMAN:  Yes.  But judge a commercial came on --

14         THE COURT:  But they do not bring in the most vulnerable

15   of our society in the same level of misconduct that whatever you

16   call sexting or pornography at all is likely to do.  In many

17   instances they are, but probably of every crime I see, the two

18   most repetitive are of the same person would be sexual crimes

19   such as defined here, and drugs.

20         Murderers generally don't repeat it.  Burglars, robbers

21   and all do repeat, but seem like the propensity is not there.

22   They go through an age stage that they wean themselves out of

23   it.

24         But the reason that sex offenders are placed under

25   reporting and notice to local authorities is because of the

1      horrible repetition that we've seen the last 50 years.

2           MR. COLEMAN:   Judge, your characterization of this case

3      as involving a sex offender is technically correct, but not in

4      any practical sense.

5           Before the Court made its last comments I was going to

6      relate what I saw in a television commercial just three weeks

7      ago for a Samsung telephone.   This man is going on a business

8      trip, and his little girls run out to the taxicab, and they say,

9      daddy, we've made you a video, you can watch it in your hotel

10     room.   And he said great.   And they were able to put their

11     phones together and the video went from one phone to the other.

12     Then his attractive, 30-something wife leans into the taxicab.

13     She takes her cellphone and she says, I made you a video, too.

14     They put their two phones together, and her videotape goes into

15     his phone.

16          This was at 2:00 in the afternoon on network television.

17     She was giving him a video of herself in states of nakedness so

18     that he could take them on his business trip for the obvious

19     purpose of watching them.   That is how widely accepted the

20     practice of exchanging videotape and picture images of yourself

21     has become.

22          The reason this is a crime in this case is because of

23     the young age of the victim.   But Jared is young, too, Your

24     Honor.   And he had -- the only experience -- the only thing he

25     knows about girls and women is what he learned from pornographic

1   websites.

2          Now, that's no place to learn how to treat or talk to a

3   woman, but you can tell from the dialogue they exchanged in that

4   that's where he got some of his ideas, and I think Agent

5   Sutcliff confirmed that in a prior hearing.

6          So his immaturity, his lack of knowledge, all these

7   forces combined to put him in this place, combined with the

8   ready and available technology so that over about a three- or

9   four-week period, Your Honor -- and that's all it was -- he has

10  the potential for ruining his life.

11         Now, he's a convicted felon, under a sex crime that is

12  going to make his access to computers problematic.  It's going

13  to make his employment prospects problematic.  The punishment

14  that he has already suffered by virtue of where he is right now

15  is extreme.  And I'm asking the Court to sentence him to no more

16  than the time that he has already served, because the only thing

17  that's going to happen when he goes to federal prison is he's

18  either going to die or get hurt or learn bad things, and he's

19  not going to come back to this city a better person unless by

20  the grace of God his faith sustains him through things that I

21  don't want to think about him having to endure.

22         It's not going to -- it's not going to change what has

23  already happened.  The PSI had a little paragraph about this

24  young girl, and the probation office, to their credit, they

25  reached out to this mother to see what the impact was.  Now, I

1    know that even though the child and the mother don't think it

2    hurt her, I know that there was an impact there that she doesn't

3    fully appreciate and that she won't fully appreciate until she

4    gets older.

5         But this is not a case where we need to send Jared to

6    prison to make compensation for the injury that this girl

7    suffered during this three-week period, because as the Court

8    observed, she had already had some experience with this kind of

9    thing.

10        So the need to punish Jared doesn't necessarily relate

11   to the victim in this case.

12        Judge, I'm troubled -- quite candidly, I'm troubled by

13   the Court's comments that you're stuck with the Guidelines,

14   because the case law in recent years is really moving in the

15   opposite direction.

16        THE COURT:  Mr. Coleman, you may stay there as long as

17   you want to and argue.  I did not say that.  I'm showing the

18   rationale for the Guidelines --

19        MR. COLEMAN:  Yes, sir.

20        THE COURT:  -- eloquently expressed by a current member

21   of the Supreme Court.  And there ought to be more of a community

22   of treatment for people similarly situated.  It ought not be

23   what a judge says, but if you want to persist in making that

24   argument, make it to your heart's content, but I shall not draw

25   back one line.

1        What I see you doing is something intellectually

2   dishonest.

3        MR. COLEMAN:  To treat sexting differently --

4        THE COURT:  No.  What you've taken what I quoted here

5   and turned it on its head.

6        MR. COLEMAN:  All right, Your Honor.  I apologize.

7   Let's just get back to the point of Gall and Kimbrough, which

8   say that the Court has the right to both disagree with the

9   Guidelines and to sentence between 0 and 10 years despite the

10  calculation of the PSI.  You have that right; you have that

11  power; you have that authority.  And I believe in this case,

12  Your Honor, it would be appropriate to do so.  And I apologize

13  if my comments misconstrued your reading of the law.  I

14  misunderstood.

15       THE COURT:  I'm simply reading you a current opinion by

16  Justice Breyer, who is generally regarded very highly.

17       MR. COLEMAN:  Yes, sir.

18       THE COURT:  And you stood it on its head.

19       MR. COLEMAN:  I apologize, Your Honor.  Your Honor,

20  that's all I have.  Thank you.

21       THE COURT:  Very good.  Ms. Greenwood.

22       MS. GREENWOOD:  Thank you, Your Honor.  First of all, as

23  the Court is well aware, it can vary outside of the Guidelines.

24  However, when it does so, that variance, which could be based on

25  any of the factors under 3553(a), needs to be proportional to

1   the reasoning given by the Court for such a variance, and that

2   courts which have varied downward significantly from a guideline

3   range must provide a reasoning that would justify that level of

4   variance, or else that ruling can be overturned by circuit

5   courts and so forth.

6        And the type of departure that's being requested here

7   from 10 years down to 10 months I would submit would require

8   such a significant justification that I can't imagine that it

9   would actually be able to be accomplished given the facts of

10  this particular case.

11       And what we have in this case is, you know, Mr. Coleman

12  has mentioned this commercial where an adult gives another adult

13  a video.  He talks about Brett Favre.  He talks about a

14  congressman.  None of those involve child victims.  None of

15  those was criminal activity.

16       And the concept -- if Congress wanted to have a

17  carve-out and say sexting between somebody who is an adult and

18  somebody who is a child is not incorporated in our Sexual

19  Exploitation of Children laws, it could do that and it could

20  have done it.  Sexting didn't arise in the last six months or a

21  year.  I mean it's been around for a while, and it's allowed

22  between adults, and it's not allowed between an adult and a

23  child, a 14-year-old, a girl who is not able to legally consent

24  to sexual acts in this state.  And yet, he is asking her to

25  engage in sexual activity and then videotape that and send it to

1    him.  And she was a willing participant in a manner of speaking,

2    but not of an age where she could legally consent.  And that's

3    where the problem lies in this case.

4         And I think that as long as this defendant is not really

5    clear on why this is a crime and why it's a problem, then the

6    problem still exists.

7         We've got an individual who says, listen, I thought she

8    was 17 at the time.  Still illegal to get a 17-year-old to send

9    the images.  Then I learned she was 14 and we only communicated

10   for a short time, a couple days after that.  Well, the reason it

11   stopped is because the mom of the 14-year-old found the phone

12   and saw what was going on and stopped it and said, stop

13   communicating with my daughter.

14        So by the time we got to his phone, there wasn't any

15   evidence on it anymore.  He'd been warned.  But he didn't stop

16   of his own free will.  He didn't stop when he learned she was

17   14.  He kept going and it kept escalating, as the text messages

18   show.

19        There is a victim.  The victim will have to deal with

20   this for quite some time.  This is not a typical case.  There

21   have already been concessions made taking into consideration the

22   defendant's age and the age difference between him and the

23   victim.  He was permitted -- in contrast with the individual who

24   was sentenced last week, he was permitted to plead to a charge

25   that capped out at 10 years, and so although as Guidelines would

1     have otherwise been much higher and a mandatory minimum would

2     have been in place of 15 years, he is only facing up to 10

3     years.

4          In this case he was communicating with this 14-year-old,

5     getting her to send pictures of herself to him, getting her to

6     do things that she did not want to do, did not feel comfortable

7     doing, but she did because they were in love.  And I would

8     submit that she truly had that emotional connection to him, I

9     think, on that level.  And as a 14-year-old --

10         THE COURT:  I need to make a telephone call.  We'll take

11    a 10-minute recess.

12         (A recess transpired from 11:49 until 11:58 a.m.)

13         THE COURT:  You may continue, Ms. Greenwood.

14         MS. GREENWOOD:  Thank you, Your Honor.  So here we have

15    a 14-year-old victim who's at an impressionable age -- she's in

16    middle school -- who's engaging in communications with an

17    18-year-old honor student who's already advanced to junior

18    status in college, a smart individual.  And this is not your

19    typical relationship.  That has sort of been the way that it's

20    been presented as, look, this is just how kids meet these days;

21    this is how they communicate with each other.

22         The reality is is that if this was something moving

23    toward any type of normal relationship, then why is the

24    defendant asking this 14-year-old to go find other child

25    pornography for him?  That's not an indication of this is a

1   person I want to be with.  It's, hey, I want something younger.

2          And then he starts talking about, hey, I can't wait till

3   we get married so we can have kids, and this is what I want to

4   do to them sexually.

5          Now, she played along and she joined in those

6   conversations.  She did.  But he is the one who is the adult.

7   She is the 14-year-old.  And he is demonstrating himself to have

8   a significant problem in his sexual attraction to children.  And

9   in fact, it was strong enough to where although his father found

10  out that he was getting online and searching out certain things

11  and counseled him about it and put safeguards on the computer,

12  he found a way to get around those.  That's how much he wanted

13  access to this.

14         And I think that rather than coming in and saying, hey,

15  I'm sorry to put everybody through this, but gosh, can you let

16  me out so I can just get on with my life, the Court needs to

17  recognize that one of the factors of 3553(a) is to provide an

18  opportunity through prison to provide the type of educational,

19  vocational, medical care and other types of elements that can

20  help somebody like this defendant, who doesn't seem yet to

21  understand that what he has done is a problem, I mean that it is

22  a sign of a bigger problem that needs addressing, a mental

23  health issue that needs addressing.

24         And that is what some additional term of imprisonment --

25  he's just been in jail.  He hasn't been in prison.  He hasn't

1    been in the BOP system.  There are prisons that provide, can

2    provide mental health resources for inmates, and that's

3    something that some prison time can effect.

4          THE COURT:  The probation officer is recommending 120

5    months.  What is the government's recommendation?

6          MS. GREENWOOD:  Well, the government doesn't have a

7    specific recommendation.  I would say that I don't think that

8    120-month sentence would be unreasonable under the circumstances

9    given that he could have been looking at something much higher.

10   But the government also recognizes that this is, you know, we

11   have a youthful individual who was engaged in this activity.

12         So if the Court wanted to downward vary on some level,

13   the government isn't going to have a lot of concerns about that.

14   But the type of variance that's being requested here down to

15   time served so he can get back to his life, that is not the

16   right type of proportional response, societal response to the

17   conduct that's involved in this particular case.

18         We have a victim who's going to have long-term

19   psychological impact and we have a defendant who's just ready to

20   just go back out into society and get on with his life.  And

21   that does not seem equitable under the circumstances.

22         This was not an aberration.  This defendant needs help.

23   He described in the text messages having seen at the place where

24   he worked a five-year-old girl and seeing her underwear and

25   having a sexual response to that.  Those are the things that

1    clue us in that this is a problem and this is an individual who

2    needs help.

3           And under this particular conviction he could be

4    sentenced up to 120 months; he can be placed on supervised

5    release; he will be a registered sex offender, all things that

6    will help all the way down the line to make sure that whatever

7    his propensity is, that it can be treated and then maintain some

8    sort of supervision over it.

9           And that's what the government would like to see in this

10   case, that there be enough time in BOP for him to receive

11   treatment that would be helpful, that there then be the

12   requirement that he register as a sex offender, time on

13   supervised release so that he can be monitored closely, because

14   we don't know who the people are who have tendencies toward

15   children.  We don't know.

16          I mean as it was testified here today, it's almost

17   always a surprise when defendants get charged with this.  The

18   families are regularly shocked.  And this is no different.  It

19   doesn't mean it didn't happen.  It doesn't mean it's not a

20   problem.  It is normal for everyone to just think, oh, my gosh,

21   I never saw this coming.  That shouldn't change what this court

22   does in sentencing.

23          So we submit it to the Court for sentencing.  We believe

24   that if a variance of any sort is offered by the Court, that it

25   should not be of the sort contemplated by the defense.  But we

1   leave it to the discretion of the Court.

2        THE COURT:  Mr. Coleman, you and Mr. Woody may come

3   forward.

4        Suffice it to say that the Court has spent a significant

5   number of hours reviewing the record, and I've listened to the

6   defendant and Mr. Coleman, his counsel.  I have reviewed the

7   statutory law.  I've looked at cases, and I have read excerpts;

8   and I'm led to a conclusion that Mr. Woody -- she touched on it

9   a moment or two ago about the graphic explanation in the

10  transcripts here that he had to little children and what he and

11  this 14-year-old were discussing on the phone.  It was talking

12  many times about children in malls and other -- and how they

13  were attracted or one or the other was attracted and what they'd

14  like to do.  It was beyond the pale of most experiences.

15       I reviewed the presentence report.  I have also taken

16  into consideration the leniency that has been accorded Mr. Woody

17  from the plea agreement and what could have happened.  I've

18  listened to Mr. and Mrs. Woody.  No doubt they gave him a good

19  home and good directions.  He was churched, and people who have

20  come here physically and also by messages, letters that are a

21  part of the record have made their feelings known that he was a

22  good young man, that he was reared by thoughtful and intelligent

23  people and that he was exposed to those things that are usually

24  in society's judgment beneficial to a child.  And yet, we see

25  what lurks below.

1          Pursuant to the Sentence Reform Act of 1984, it is the

2    judgment of the Court that the defendant, Jared Woody, is

3    committed to the custody of the Bureau of Prisons to be

4    imprisoned for a term of 66 months.  The Court has departed

5    significantly below the Guidelines because I want it to be

6    severe enough to let him know and let all know that this is

7    inappropriate conduct.  Not only is it inappropriate, it's

8    violative of the law.  Not only is it violating the law, but it

9    is damaging to future generations.

10         The victim is already going down a path that I don't

11   think that he started, but out there they're trolling for each

12   other.  Well, there has to be some sticks and carrots.  Yet on

13   the other side, the side that gives me some hope is the advice

14   and counsel of parents.  They have done all that I think any

15   parent could do, and yet the harm is done, and the harm is

16   capable of repetition.  And as I voiced my concerns earlier,

17   what you are accused of doing and pled guilty is one of those

18   offenses that the Court sees repetition over and over.

19         The sentences finally get to be Draconian.  About the

20   second or third time down the road there is no hope for you

21   anymore because the federal law as it is constructed pretty well

22   takes you out of circulation for the remainder of your life.

23         Now, that is the large issue and the large picture that

24   I've seen in trying to assess you and give a sentence that would

25   be appropriate.  Now, the Court recognizes that the defendant

does not have the ability to pay a fine within the range of the guideline.  But after considering the factors set forth in U.S.S.G. 5E1.2(d), the Court determines that a fine will be levied against the defendant at $3,600.

Payment will begin while he's in the custody of the Bureau of Prisons at a rate of at least $25 per quarter.  And if he's working in prison industries, 50 percent of any monthly income will be withheld, or earnings, and remitted to the Clerk of the United States District Court, Southern District of Georgia for payment of the fine.

Now, I believe if that is not paid -- that would take how long, 36 months to pay it?

MR. BRAGG:  Yes, Your Honor.  $100 a month.

THE COURT:  Yeah.  $125 a month over 30 months will have to be paid if you do not pay it while you are in custody.

And the $100 due as a special assessment to the government is due immediately.

Now, upon release from imprisonment, you shall be placed on supervised release for the remainder of your life, and you'll comply with the standard conditions of supervision adopted by this court and those that are made mandatory by 18 U.S.C. 3583.

You'll be tested for drugs.  There's a lifetime prohibition against you owning, using or possessing a firearm or any dangerous weapon, and the probation officers are to collect a DNA sample pursuant to 18 U.S.C. 3583.

1        You shall not tamper with any tests that you're required

2    to take.  And the probation officers as agents of the Court are

3    to provide the Court any financial information sought.

4        Now, when you're out, you shall attend and participate

5    in a mental health treatment program including sex offender

6    treatment, and you will abide by the rules, requirements and

7    conditions of the treatment program to include random polygraph

8    examination.  Cost of that is to be paid by you, subject to

9    finding agencies that might provide it free, or make third-party

10   payments.

11       You shall not possess, access, subscribe to or view any

12   video, magazine, literature, photographs, images, drawings,

13   video games or Internet websites depicting children or adults in

14   the nude or engaged in sexual activity nor shall you have any

15   contact with anyone under the age of 18, unless accompanied by a

16   responsible adult previously approved by some court officer; and

17   that's usually a probation officer.

18       Now, when I say contact, that is defined for this

19   purpose as person to person, over the telephone, through the

20   mail, over the Internet and third-party contact.

21       You shall register as a sex offender with the

22   appropriate federal, state and local authorities and comply with

23   all registration requirements.  And your person, your residence,

24   your vehicle and electronic devices are subject to search at

25   reasonable time and reasonable manner by a United States

1    Probation Officer.

2         Now, you shall not possess or use a computer with access

3    to any online service at any location without prior approval of

4    the Court as granted through the probation office.  This

5    prohibition includes any Internet service provider, any bulletin

6    board system or any other public or private computer network.

7    Nor shall you possess any computer for employment purpose

8    without prior approval of the Court, and you shall consent to

9    third-party disclosures to any employer or potential employer of

10   any computer-related restriction imposed by the Court.

11        Now, the probation officers are to provide you a written

12   statement of the terms and conditions of your supervised

13   release.

14        The plea of guilty is accepted.  Plea agreement is

15   accepted; and counts 1, 3 and 4 of the superseding indictment

16   are dismissed.

17        You are remanded to the custody of the United States

18   Marshal.  The Bureau of Prisons will designate a facility

19   considering the offense.

20        Pursuant to the plea agreement with limited exceptions,

21   you waive all of your rights conferred by 18 U.S.C. 3742 to

22   appeal the sentence.  You waive your right to appeal the

23   sentence on any other ground and waive your right to attack

24   sentence in any post-conviction proceeding.

25        There are objections in the record.  The Court has ruled

1    upon those.

2          Now, are there any other objections to the Court's

3    finding of fact, conclusion of law or the manner in which

4    sentence was pronounced?

5          MR. COLEMAN:  No, Your Honor.  One comment about the

6    placement by the Bureau of Prisons.  I understand the Court has

7    the ability to make some designation.  My client has expressed

8    some interest in Jesup.  I don't know if --

9          THE COURT:  I want him to be classified, and I'm going

10   to leave that up.  It might very well be Jesup.  Ms. --

11         MS. GREENWOOD:  No objection from the government, Your

12   Honor.

13         THE COURT:  All right.  Sound the next case.

14              (Proceedings concluded at 12:15 p.m.)

15                          - - -

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2                                                 PAGE

 3   WITNESSES
         JOHN RAYMOND HOLLOWAY
 4           Direct Examination by Mr. Coleman      20
             Cross-Examination by Ms. Greenwood     23
 5
         LISA DELOACH
 6           Direct Examination by Mr. Coleman      25

 7       CURTIS WOODY
             Direct Examination by Mr. Coleman      29
 8
         CHARLOTTE WOODY
 9           Direct Examination by Mr. Coleman      40
             Cross-Examination by Ms. Greenwood     46
10
         Certificate of Reporter                    73
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          CERTIFICATE

 2

 3   GEORGIA:

 4   CHATHAM COUNTY:

 5

 6      I, Kelly McKee Dorsey, Registered Professional Reporter and

 7   Certified Shorthand Reporter for the State of Georgia, do

 8   hereby certify:

 9      That the foregoing proceedings were taken before me on the

10   date and at the time and location stated on Page 1 of this

11   transcript; that the witnesses (if any) were duly sworn to

12   testify to the truth, the whole truth, and nothing but the

13   truth; that the testimony of any witnesses and all objections

14   made at the time of this proceeding were recorded

15   stenographically by me and transcribed by computer-aided

16   transcription; that the foregoing proceedings as typed are a

17   true, accurate, and complete record of the proceedings and

18   testimony of any witnesses and of all objections made at the

19   time.

20      I further certify that I am neither related to nor counsel

21   for any party to the cause pending or interested in the events

22   thereof.

23

24

25
```

1     Witness my hand, I have hereunto affixed my official seal

2   this 21st day of January, 2013 at Savannah, Chatham County,

3   Georgia.

4

5

6

7

8                    *Kelly McKee Dorsey*
                    _____

9                    KELLY McKEE DORSEY, CCR, RPR, CRR

10                   #2731

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25